**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMCO INSURANCE COMPANY, as subrogee of Wirtz Corp Mundelein,<br><br>     Plaintiff,<br><br>v.<br><br>GREE USA, INC., GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCE SALES, LTD., MJC AMERICA, LTD. and MJC AMERICA HOLDINGS CO., INC.,<br><br>     Defendants. | Case No.:  24-cv-11348<br><br><br>**JURY DEMANDED** |

**COMPLAINT**

NOW COMES Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, by and through its attorneys, and for its Complaint against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co., Inc., alleges:

**PARTIES**

1.     Plaintiff, AMCO Insurance Company (hereinafter "AMCO"), is a corporation duly organized and existing under the laws of the State of Illinois with its principal place of business located at 1100 Locust St., Des Moines, IA 53091 and at all times material hereto was duly authorized to issue policies of property insurance in the State of Illinois.

2.     At all times relevant, AMCO insured Wirtz Corp Mundelein against loss and damages to its property under a policy of insurance arising from the circumstances set forth in this in this Complaint.

3.     At all times relevant, Plaintiff's insured, Wirtz Corp Mundelein, ("Wirtz") is an Illinois corporation with a place of business located at 21888 W IL Route 60, Mundelein, Illinois (the "Premises").

4.     All relevant times, Defendant Gree USA, Inc. ("Gree USA") is, upon information and belief, a California corporation with a principal place of business at 4195 Chino Hills Parkway #1026, Chino Hills, CA 91709.

5.     At all relevant times, Defendant Gree USA was and remains engaged in the business of manufacturing, distributing, and/or selling dehumidifiers which were contemplated and intended to enter the stream of commerce in Illinois.

6.     All relevant times, Defendant Gree Electric Appliances, Inc. of Zhuhai ("Gree China") was and remains a Chinese business entity that most resembles the United States business form of a corporation with its principal place of business located at Jinji Road West, Qianshan Zhuhai, Guangdong 519070 China and is a citizen of the People's Republic of China.

7.     At all relevant times, Defendant Gree Electric Appliances, Inc. of Zhuhai was and remains engaged in the business of manufacturing, distributing, and/or selling dehumidifiers which were contemplated and intended to enter the stream of commerce in Illinois.

8.     At all relevant times, Defendant Hong Kong Gree Electric Appliance Sales, Ltd. ("Gree Hong Kong") was and remains a Honk Kong, China business entity that most resembles the United States business form of a corporation with its principal place of business located at Unit 2612 Miramar Tower, 132 Nathan Road, Tsin Sha Tsui, Kowloon, Hong Kong, S.A.R. and is a citizen of the People's Republic of China.

9.     At all relevant times, Defendant Hong Kong Gree Electric Appliance Sales, Ltd. was and remains engaged in the business of manufacturing, distributing, and/or selling dehumidifiers which were intended to enter the stream of commerce in Illinois.

10.     At all relevant times, Defendant MJC America, Ltd. is a California corporation with a principal place of business located at 280 S. Lemon Ave., #1507, Walnut, California 91788

11.     At all relevant times, Defendant MJC America, Ltd. was and remains engaged in the business of manufacturing, distributing, and/or selling dehumidifiers which were intended to enter the stream of commerce in Illinois.

12.     At all relevant times, Defendant MJC America Holdings Co., Inc. was and remains a foreign corporation organized under the laws of California and transacting business in Illinois.

13.     At all relevant times, Defendant MJC America Holdings Co., Inc. was and remains engaged in the business of manufacturing, distributing, and/or selling dehumidifiers which were intended to enter the stream of commerce in Illinois.

14.     Hereinafter, both Defendant MJC America, Ltd. and Defendant MJC America Holdings Co., Inc. will be referred to collectively as "MJC".

15.     At all relevant times, Defendant Gree Hong Kong was and remains an alter ego of Gree China.

16.     At all relevant times, Gree USA was and remains the agent of Gree China and Gree Hong Kong for purposes of service of process.

17.     At all relevant times, Gree China exerted control over Gree USA's day-to-day activities, shared the same corporate officers, commingled branding, assumed debts, and exerted other such control.

18.     All relevant times, Gree China exerted and continues to exert such control over Gree USA and Gree Hong Kong as to cause the companies to lose their separate identities.

19.     Service of process upon Gree China and Gree Hong Kong can be accomplished in the United States and without implicating the Hague Convention. The Hague Convention is not implicated when service of process is made in the United States as opposed to abroad.

3

20.     Upon information and belief, Defendants MJC were and remain a minority owner of Gree USA.

21.     Defendants Gree USA, Gree China, Gree Hong Kong, and MJC conduct and have conducted substantial business in Illinois including the marketing, sale, and distribution of the dehumidifier at issue, such that each Defendant has purposefully availed itself of the forum.

22.     Defendants Gree USA, Gree China, Gree Hong Kong, and MJC each derive substantial revenue from the sale of consumer products, including the dehumidifier at issue, to Illinois consumers and retailers doing substantial business in Illinois.

23.     Defendants Gree USA, Gree China, Gree Hong Kong, and MJC each have sold and shipped products into Illinois.

24.     The fire and loss that forms the basis of this cause of action occurred in Lake County, Illinois and relates to Defendants Gree USA, Gree China, Gree Hong Kong, and MJC's contacts with Illinois which are significant.

25.     At all relevant times, Defendants Gree USA, Gree China, Gree Hong Kong, and MJC participated in placing dangerous and defective dehumidifiers, including the dehumidifier which caused the fire at issue in this cause of action, into the stream of commerce with the expectation that they would be purchased and utilized by consumers in Illinois.

26.     Defendants Gree USA, Gree China, Gree Hong Kong, and MJC are each the actual manufacturer of the product at issue as well as the apparent manufacturer of the product based on its branding.

## JURISDICTION AND VENUE

27.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000.

LEGAL\71310861\1

Venue is proper in this Court because the causes of action and events surrounding the loss involve a fire that occurred at property located in Lake County, Illinois

28.     Venue in this action is proper in this District Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District.

## COMMON ALLEGATIONS

29.     Prior to August 7, 2022, Wirtz purchased and owned a dehumidifier designed, manufactured, marketed, distributed, and/or sold by Defendants Gree USA, Gree China, Gree Hong Kong, and MJC (the "Dehumidifier").

30.     At all relevant times, Wirtz used the Dehumidifier in a manner and for the purpose intended by Defendants Gree USA, Gree China, Gree Hong Kong, and MJC to reduce humidity levels in Wirtz's property.

31.     On or about August 7, 2022, the Dehumidifier suddenly and catastrophically caught fire in the basement of the Premises (the "Fire").

32.     The Fire caused fire, smoke, and water damage to Wirtz's real and business property.

33.     Wirtz thereafter made a claim to AMCO pursuant to the Policy for its losses arising from the Fire.

34.     Pursuant to its obligations under the Policy, AMCO reimbursed Wirtz in an amount in excess of two million, one hundred thousand dollars ($2,100,000).

35.     By virtue of its payments to Wirtz, AMCO is now legally, equitably, and contractually subrogated to Wirtz's claims against any responsible third parties, including claims against Defendants Gree USA, Gree China, Gree Hong Kong, and MJC.

LEGAL\71310861\1

## BACKGROUND OF DEFENDANTS AND THEIR RELATIONSHIP

36.     At all relevant times, Gree USA was and remains engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, importing, and selling certain household appliances including but not limited to dehumidifiers for residential use, including the subject Dehumidifier at issue in this lawsuit. (***See Statement of Facts attached as Exhibit 1).***

37.     At all relevant times, Gree China was and remains engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, exporting, and selling certain household appliances including but not limited to dehumidifiers for residential use, including the subject Dehumidifier at issue in this lawsuit.

38.     At all relevant times, Gree Hong Kong was and remains engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, exporting, and selling certain household appliances including but not limited to dehumidifiers for residential use, including the subject Dehumidifier at issue in this lawsuit.

39.     At all relevant times, MJC, upon information and belief, were and remain engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, importing, and selling certain household appliances including but not limited to dehumidifiers for residential use, including the subject Dehumidifier at issue in this lawsuit.

40.     From 2007 to September 2013, Gree China was a large Chinese company that manufactured household appliances for sale inside and outside of China, including in the United States.

41.     From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree China that exported Gree appliances to the United States.

LEGAL\71310861\1

42.     From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong.

43.     Gree USA sold Gree appliances to retailers in the United States including dehumidifiers that were manufactured by Gree China.

44.     These Gree appliances were manufactured by Gree China and imported into the United States by Gree Hong Kong and Gree USA.

45.     On April 23, 2010, MJC, two privately held California-based manufacturers, importers, and distributers of home comfort products, entered into a joint venture agreement with Gree China to promote the sale of Gree China's products throughout the United States, including Illinois.

46.     Pursuant to the joint venture agreement, MJC transferred their existing customer accounts, which included The Home Depot, Inc., Lowes Companies, Inc., Menard, Inc., BJ's Wholesale Club, Inc., and Sears Corp., to Gree USA, a corporation formed as part of the joint venture, with 51 percent of its stock owned by Gree Hong Kong and the remaining 49 percent owned by MJC.

47.     The parties agreed that Gree USA would primarily market and sell the products manufactured by Gree China.

48.     Gree USA was a joint venture between Gree Hong Kong and MJC.

49.     Gree Hong Kong was the majority owner of Gree USA.

50.     Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Chief Administrative Officer ("CAO") were owners of MJC.

51.     Gree USA's CEO, CFO, and CAO effectively controlled Gree USA.

52.     From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree China and imported into the United States by Gree Hong Kong.

7

53.     Gree USA and Gree Hong Kong are the alter egos of Gree China as all three entities operate as one and the same with Gree China exerting substantial control over the day-today operations of all three entities and with Gree Hong Kong and Gree USA dependent upon Gree China for money as both entities are incapable of operating financially without the backing of Gree China.

### THE CONSUMER PRODUCT SAFETY COMMISSION,
### THE CONSUMER PRODUCT SAFETY ACT AND ITS APPLICATION

54.     The United States Consumer Product Safety Commission (the "CPSC") was created by the Consumer Product Safety Act of 1972 (the "CPSA"). 15 U.S.C§ 2053.

55.     At all relevant times, the CPSC was and remains a federal agency responsible for protecting consumers from dangerous consumer products and is the lead federal agency responsible for the implementation, enforcement, and administration of the CPSA.

56.     One of the core purposes and legal functions of the CPSC is "to protect the public against unreasonable risks of injury associated with consumer products". 15 U.S.C § 2051(b)(1).

57.     At all relevant times, the CPSA mandated safety practices and placed certain legal obligations on companies that manufacture, import, distribute, or sell consumer products including Defendants Gree USA, Gree China, Gree Hong Kong, and MJC.

58.     The CPSA was created and exists for the primary purpose of keeping American consumers, including Illinoisans, safe from defective and dangerous products.

59.     To assist the CPSC's ability to fulfill the function of protecting consumers against unreasonable risk of serious injury or death, the Act requires manufacturers, importers, distributors, and retailers of consumer products to report "immediately" to the CPSC information that reasonably supports the conclusion that a product contains a defect that could create a substantial product hazard or creates an unreasonable risk of serious injury or death. 15 U.S.C § 2064(b).

**UNDERWRITERS LABORATORIES STANDARDS AND CERTIFICATIONS**

60.     Underwriters Laboratories ("UL") is an organization formed in 1894 and incorporated in 1906 whose primary purpose and mission is to promote and ensure safe living and working environments in the United States and abroad.

61.     UL has been providing its labeling service to product manufacturers and sellers in the United State since 1906, the purpose of which is to verify and confirm that a product sold in the U.S. meets the current industry testing standards.

62.     At all relevant times, one of the CPSA's requirements has been and remains that certain products meet UL testing standards and become UL certified.

63.     The subject Dehumidifier was one such product that required UL certification.

**DISTRIBUTION SCHEME FOR THE DEFECTIVE DEHUMIDIERS IN THE U.S.**

64.      Between, 2007 and 2013, Gree USA sold more than two million defective Gree dehumidifiers in the United States including Illinois, which were manufactured by Gree China and exported/imported by Gree Hong Kong.

65.     The defective Gree dehumidifiers had plastic parts that did not meet UL standards as required by the CPSA and were therefore prone to catching fire.

66.     At all relevant times, including but not limited to, during 2007 through 2013, Defendants had an obligation to refrain from selling dangerous or defective Gree dehumidifiers to United States' citizens including Illinoisans.

67.     At all relevant times, including but not  limited to during 2007 through 2013, Defendants knew that they had an obligation to refrain from selling dangerous or defective Gree dehumidifiers to United States' citizens including Illinoisans.

68.     At all relevant times, the CPSA required that the Defendants inform the CPSC about any consumer products regarding which information reasonably supported the conclusion

9

that such product contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death. 15 U.S.C.§ 2064(b).

69.     At all relevant times, the Defendants knew that they had the obligation pursuant to the CPSA to inform the CPSC about any consumer product regarding which information reasonably supported the conclusion that such product contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death.

70.     During 2007 through 2013, many fires were reported to Defendants by, including but not limited to, their consumers that were caused by the dangerous and defective Gree dehumidifiers sold by Defendants with the substandard plastic parts that were prone to catching fire.

71.     The information about fires being caused by dangerous and defective Gree dehumidifiers sold by Defendants with the substandard plastic parts that were prone to catching fire constituted information which reasonably supported the conclusion that such products contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death.

72.     As such, at all relevant times, including but not limited to, during 2007 through 2013, Defendants had an obligation to inform the CPSC of information about the dangerous and defective Gree dehumidifiers with substandard plastic parts that were prone to and were catching fire.

73.     Despite such information, between 2007 and September of 2013, the Defendants continued to sell and place into the United States market and stream of commerce as well as homes in Illinois these dangerous and defective Gree dehumidifiers.

74.     Beginning in July of 2012 and continuing until September of 2013, the Defendants gained additional information and had, at least as of that time, actual knowledge that the defective

10

Gree dehumidifiers were dangerous in that they were prone to catching fire and burning down Americans' homes and putting American lives in grave danger.

75.     For example, in July of 2012 Simon Chu and Charley Loh, two co-owners and officers of MJC and Gree USA, emailed with each other and other senior executives regarding the serious issues with the defective Gree dehumidifiers catching fire.

76.     In fact, one such email contained a consumer's video of a burning defective Gree dehumidifier.

77.     Despite this grave danger, the Defendants focused primarily on the financial threat of a potential product recall and not on the profound and grave danger posed to American consumers including Illinoisans.

78.     From at least July of 2012 until April 30, 2013, the Defendants continued to receive reports from consumers and insurance companies of the Defective Gree dehumidifiers catching fire.

79.     Despite this actual knowledge, the Defendants chose for over a year to continue to sell and place into American homes the dangerous and defective Gree dehumidifiers that were putting American lives in grave danger.

80.     Despite this actual knowledge and the affirmative reporting requirements contained in the CPSA, the Defendants chose to withhold such information from the CPSC from at least July of 2012 through September 12, 2013.

81.     Despite this actual knowledge and the affirmative reporting requirements contained in the CPSA, the Defendants chose to withhold such information from the retail companies that bought the dangerous Gree dehumidifiers and resold them to American consumers including Illinoisans from at least July of 2012 through September 12, 2013.

82. The Defendants did not stop selling the dangerous and defective Gree dehumidifiers until September 12, 2013, more than a year after they learned of the grave danger to American lives.

83. The Defendants did not issue a recall of the dangerous and defective Gree dehumidifiers until September 12, 2013.

84. Plaintiff's insured, Wirtz, purchased one of the dangerous and defective Gree dehumidifiers and were never notified of any recall, danger, or even any concern with it being a gravely dangerous and defective Gree dehumidifier.

85. Plaintiff's insured, Wirtz, used the dangerous and defective Gree dehumidifier in his home completely unaware that the Defendants were manufacturing, distributing, selling, and concealing the gravely dangerous and defective Gree dehumidifiers.

## DEFENDANTS' FALSIFICATION OF UL CERTIFICATION

86. From at least January 2008 to late 2013, Defendants designed, manufactured, supplied, distributed, imported, marketed, and sold approximately 2.5 million consumer dehumidifiers throughout the United States including Illinois which were included in a series of recalls initially announced in 2013, expanded in 2013, expanded again in 2014, and reannounced in 2016. These recalls were based on serious fire hazards associated with the recalled dehumidifiers. **(S*ee List of Recalls attached as Exhibit 2).***

87. As part of its plan to penetrate the U.S. consumer market, Gree China needed a brand name that major U.S. retailers were familiar and comfortable with so that these retailers would purchase products manufactured by Gree China.

88. In or around 2008, Gree China, for the purpose of increasing sales in the United States and for the purpose of associating itself with a brand familiar to retailers in the United States,

LEGAL\71310861\1

approached MJC in California about MJC selling and promoting Gree products to retailers in the United States including Home Depot, Sears, Lowe's, and other similar retail chains.

89.     Starting in 2010, Gree China and MJC agreed to brand dehumidifiers under the name "SoleusAir powered by Gree" as a test case to determine if MJC's Soleus brand could assist Gree China in penetrating the United States market.

90.     From January of 2010 until October of 2010, Gree China exported at least 421,000 dehumidifiers bearing the "SoleusAir powered by Gree" brand to MJC in California for distribution to U.S. retailers, including retailers in Illinois.

91.     Gree China and Gree Hong Kong represented to MJC, Gree USA, retailers, and the general public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the design and materials used in the manufacturing of its dehumidifiers complied with UL Standard 474 and Standard 94.

92.     As part of the UL certification process, Gree China and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with the fire rating in UL 94.

93.     UL 94 requires that consumer electric products including dehumidifiers use plastics that have specific burn and flame rates in order to prevent, reduce, and limit the risk of fire hazards.

94.     In its application for UL certification under UL 474, Gree China and Gree Hong Kong represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

95.     Gree China's representations that the materials and plastics used to manufacture and construct the dehumidifiers were compliant with UL 94 were false.

96.     The Defendants knew that the representations that the materials and plastics used to manufacture and construct the dehumidifiers in compliance with UL 94 were false.

13

97. Gree China and Gree Hong Kong made these false and misleading representations while knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

98. Gree China and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94 and that UL would rely on Gree China's representations in the certification documents stating that Gree China had these tests performed and the dehumidifiers complied with UL 94.

99. At all relevant times, retailers in the United States would not purchase and sell dehumidifiers that were not certified by UL.

100. Defendants knew that retailers in the United States would not purchase and sell dehumidifiers that were not certified by UL.

101. At all relevant times, consumers in the United States would not and could not purchase dehumidifiers that were not certified by UL because retailers in the United States would not purchase or sell non-UL listed electric products.

102. Defendants knew that consumers in the United States would not and could not purchase dehumidifiers that were not certified by UL because retailers in the United States would not purchase or sell non-UL listed electric products.

103. Gree China's and Gree Hong Kong's falsification of the UL Certification process was done for the purposes of misleading UL into improperly certifying the dehumidifiers and, in so doing, Gree China and Gree Hong Kong defrauded and misled retailers and consumers in the United States into purchasing its dehumidifiers on the false belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

104. Although Defendants knew that the dehumidifiers were not compliant with UL flammability standards, they sold, marketed, offered for sale, distributed in commerce, exported,

and imported the dehumidifiers bearing the UL mark with the specific intent to defraud consumers including the Plaintiff.

105.    From 2008 until the present, Gree China was and remains an original equipment manufacturer for General Electric ("GE") branded dehumidifiers.

106.    In late 2010, GE instructed Gree China to make certain design changes and product improvements to GE branded Gree China manufactured dehumidifiers.

107.    These design changes were mandated by GE due to product failure issues with the dehumidifiers including the same overheating issues and fires that occurred with the "SoleusAir powered by Gree" dehumidifiers and the subject Dehumidifier.

108.    The GE mandated design changes required (a) the removal of electrical terminal sleeves that used PVC materials; (b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers including the fan shroud base, center support, and external cabinet; and (c) the use of UL 94 flammability rated materials for the terminal cover.

109.    Starting in its January 2011 production run, Gree China made the above requested changes for GE dehumidifiers only.

110.    Gree China did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was manufacturing and selling to Gree USA and MJC including but not limited to the subject Dehumidifier.

111.    Gree China did not make the GE mandated design changes despite actual knowledge that the design and material defects identified by GE were causing Gree China's dehumidifiers to fail, overheat, and catch on fire.

112.    Since January of 2011, Gree China manufactured and sold approximately 1,400,000 dehumidifiers to Gree USA and MJC in California that Gree China and the other

Defendants knew were defective because they did not incorporate the GE mandated design and materials changes.

113.    The majority owner of Gree USA is Gree Hong Kong, a wholly owned subsidiary of Gree China.

114.    The common Officers and Directors of Gree China and Gree USA knew that the dehumidifiers were not compliant with UL standards as they had approved the GE design changes, and they also approved the continued manufacture and sale of dehumidifiers for other brands without the GE mandated design changes.

**THE INDICTMENTS**

115.    On or about October 26, 2021, Gree China, Gree Hong Kong, and Gree USA were indicted criminally in United States District Court for the Central District of California in Case No. 2:21-cr-00498 as is set forth in more detail below. (***See Information attached as Exhibit 3).***

116.    Following this indictment, Gree China and Gree Hong Kong entered into a valid and enforceable Deferred Prosecution Agreement addressing such charges. (**S*ee Deferred Prosecution Agreement attached as Exhibit 4)****.*

117.    Gree USA pleaded guilty to Failure to Furnish Information Required by 15 U.S.C.§ 2064(b)(3) and (4) in violation of the CPSA, Title 15, United States Code, Sections 2068(a)(4) and 2070.

118.    In the Deferred Prosecution Agreement, Gree China and Gree Hong Kong admitted to the unqualified truth and accuracy of the Statement of Facts incorporated by reference here as Exhibit 1 and that such facts were sufficient to support a conviction and prove their guilt to the charges described therein.

119. In its Plea Agreement, Gree USA admitted that it was in fact guilty of the offense to which it was pleading and admitted to the unqualified truth and accuracy of the Statement of Facts.

120. As an enforceable and material term of the Deferred Prosecution Agreement, Gree China and Gree Hong Kong stated and expressly agreed as follows:

> Gree Zhuhai (herein "Gree China") and Gree Hong Kong agree that: "they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

*See Exhibit 4, pages 27-28, ¶ 42.*

121. Any statement in any legal pleading filed in this present action made by the Defendants constitutes a "public statement in litigation or otherwise" by Gree China and Gree Hong Kong as described in the Deferred Prosecution Agreement.

122. According to the foregoing, ANY denial or qualification whatsoever other than an unqualified admission to Paragraphs 124 - 173 below would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein

### THE COVER UP

123. The following Paragraphs 124 through and including 173 detail the background and coverup leading to the fire that injured Plaintiff and are verbatim quotes from the Statement of Facts regarding Gree China, Gree Hong Kong, and Gree USA that have expressly been adopted and admitted as true and correct without qualification, subject to the penalties set forth in the Breach of Agreement subsection of the Deferred Prosecution and Plea Agreements as well as to subsequent additional federal prosecution for its admittedly criminal and wrongful conduct. *See Exhibit 4, pages 22-27, ¶¶ 37-41*

**THE GREE COMPANIES**

124. From 2007 to September 2013, Gree Zhuhai was a large Chinese company that manufactured household appliances ("Gree appliances") for sale in and outside of China, including in the United States. Exhibit 4 ¶ 1 (*Exhibit B starts on Page 51*).

125. From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree Zhuhai that exported Gree appliances to the United States. *See Exhibit 4 ¶ 2.*

126. From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong. Gree USA sold Gree appliances to retailers in the United States. Those Gree appliances were manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong and Gree USA. Gree USA was a joint venture between Gree Hong Kong and another company, MJC America Holdings Co., Inc. ("MJC America Holdings"). Gree Hong Kong was the majority owner of Gree USA. Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO, and Chief Administrative Officer ("CAO") were owners of MJC America Holdings. Gree USA's CEO, CFO and CAO effectively controlled Gree USA. *Exhibit 4 ¶ 3.*

127. From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong ("Gree dehumidifiers"). *Exhibit 4 ¶ 4.*

**THE CONSUMER PRODUCT SAFETY COMMISSION AND
THE CONSUMER PRODUCT SAFETY ACT**

128. The Consumer Product Safety Act (the "CPSA") was enacted to protect the public from dangerous consumer products. *Exhibit 4 ¶ 5.*

129. The United States Consumer Product Safety Commission (the "CPSC") is the federal agency responsible for protecting consumers from dangerous consumer products and is the

lead federal agency responsible for the implementation, enforcement, and administration of the CPSA. The CPSC can order mandatory recalls of dangerous products. *Exhibit 4 ¶ 6.*

130. The CPSA requires companies that manufacture, import, distribute, or sell consumer products to inform the CPSC, among other things, about any consumer product about which information reasonably supports the conclusion that such product contains a defect that could create a substantial product hazard, or creates an unreasonable risk of serious injury or death. This duty to report also applies to the individual directors, officers, and agents of those companies. A company's or an individual's knowing and willful failure to report an unsafe product to the CPSC is punishable as a felony violation of the CPSA. *Exhibit 4 ¶ 7.*

### THE GREE COMPANIES LEARN THAT THEIR DEHUMIDIFIERS ARE CATCHING FIRE

131. On or about July 26, 2012, the CEO of Gree USA saw a video of a burning Gree dehumidifier. On July 26, 2012, Gree USA's CEO sent the video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"), who was also a director of Gree Hong Kong and in charge of exporting Gree appliances for sale in the United States, copying other Gree USA employees and a Gree Zhuhai employee. In sending the video, Gree USA's CEO labeled the email "urgent," and said that the video was "scarey [sic] to just watch" and a "very serious issue with GREE product quality." Gree USA's CEO also stated that the video was the third reported instance of a Gree appliance catching fire since on or about June 2012 and that it could lead to lawsuits against Gree USA as well as a recall costing millions of dollars. Gree USA's CEO knew that the Gree Companies had an obligation to inform the CPSC immediately of any consumer product that contained a defect creating a substantial product hazard or that created an unreasonable risk of serious injury or death. *Exhibit 4 ¶ 8.*

132. Gree Hong Kong Manager #1, replied to the July 26, 2012 email from Gree USA's CEO that same day. In his reply email, Gree Hong Kong Manager #1 said that "[w]e also felt shock

when we watched the video[,]" and that he had sent the video to Gree Zhuhai's Quality Department and to Gree Zhuhai's chief engineer who was also its senior vice president for research and development. *Exhibit 4 ¶ 9.*

### THE GREE COMPANIES LEARN THAT TWO DEFECTS IN THEIR DEHUMIDIFIERS ARE CAUSING THEM TO CATCH FIRE

133.    During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for potential defects that could cause them to catch fire. No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012. *Exhibit 4 ¶ 10.*

134.    On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers. The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these dehumidifiers burned. The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch the fire and apparently the material is not according to UL standard! I don't think the factory is telling us the fact and truth…" The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers. *Exhibit 4 ¶ 11.*

135.    On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any expense and responsibility." That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects. Gree Hong Kong Manager #1 replied on September 6, 2012, stating that

they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical information if you need any." After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects. *Exhibit 4 ¶ 12*

136.    On September 10, 2012, Gree USA's CEO emailed the highest-ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong Kong. In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC. Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance. Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC information about a dangerous product could face severe punishment, including criminal prosecution. Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers. Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers. No one replied to this email. *Exhibit 4 ¶ 13.*

137.    On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1. In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook." Gree USA's CEO also discussed the financial costs and lost sales that could result from a recall. He did not express

any consideration or concern about how defective Gree dehumidifiers could harm consumers. Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhai's chief engineer. *Exhibit 4 ¶ 14.*

138. On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO. A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting. This meeting was audio recorded by agreement. *Exhibit 4 ¶ 15.*

139. At this September 19 meeting, Gree Hong Kong Manager #1 stated that Gree Zhuhai's testing of the Gree dehumidifiers was not able to reproduce the reported fire but had revealed two defects: (1) the dehumidifiers used plastics that did not meet UL standards for fire resistance; and (2) electrical arcing caused by the dehumidifiers' compressors overheating could burn the non-UL standard plastic used in these dehumidifiers. The Gree Zhuhai engineer at the meeting also discussed these defects. Gree Hong Kong Manager #1 stated that he was aware of at least five consumer reports of Gree dehumidifiers overheating and catching fire but that Gree Zhuhai "still believe[d] that the fire case is a relatively isolated case… associated with atrocious conditions." He also stated that Gree Zhuhai would modify the manufacture of all future dehumidifiers to fix this problem so they would not catch fire. *Exhibit 4 ¶ 16.*

### THE GREE COMPANIES DECIDE TO DELAY REPORTING AND RECALLING THEIR DEFECTIVE DEHUMIDIFIERS

140. At this same September 19 meeting, Gree Hong Kong Manager #1 said that the meeting participants' decisions on what to do about the Gree dehumidifiers should be guided by the principle of minimizing the costs and loss of reputation to the Gree Companies. Gree Hong Kong Manager #1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers for 6 to 9 months because delaying a recall would reduce the recall's effect on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that an immediate recall would have a significant, and negative,

effect on 2012 and 2013 Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. *Exhibit 4 ¶ 17.*

141.    In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications. But the Gree USA CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall. Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because that test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed. *Exhibit 4 ¶ 18.*

142.    Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson. In his September 21, 2012 email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months. Gree USA's CEO also said that he thought that the Gree dehumidifiers were still likely to catch fire, and that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government. *Exhibit 4 ¶ 19.*

143.    The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson. In his September 22, 2012 email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion

about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion. Gree Zhuhai's chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhai's board chairperson and listen to her opinion. *Exhibit 4 ¶ 20.*

144.    On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong. In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated. Gree USA's CEO said that it was known that these two defects could cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact catching fire. Gree USA's CEO also said that the Gree Companies had sold millions of these defective dehumidifiers. Gree USA's CEO further related that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall could cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share. But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government. Gree USA's CEO concluded his email by saying that this was a very important and urgent matter. Neither Gree Zhuhai's board chairperson nor anyone else at Gree Zhuhai replied to this email. *Exhibit 4 ¶ 21.*

145.    Despite the Gree USA's CEO's September 4, 10, 21, and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known

consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012. *Exhibit 4 ¶ 22.*

146.    In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 4 ¶ 23.*

### THE GREE COMPANIES CONTINUE TO SELL THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

147.    On October 19, 2012, a sales representative for Gree USA met in person with Gree Zhuhai's board chairperson in China. During this meeting, the sales representative discussed the defective Gree dehumidifiers with Gree Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she would send a new Gree Hong Kong manager ("Gree Hong Kong Manager #2") to the United States to address the problems associated with the dehumidifiers. *Exhibit 4 ¶ 24.*

148.    In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of fires related to the Gree dehumidifiers. These reports contradicted Gree Hong Kong Manager #1's statements at the September 19 meeting that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent dehumidifiers from overheating and catching fire and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. Despite these new consumer reports of fires caused by Gree dehumidifiers, no

employee of the Gree Companies informed the CPSC about the dehumidifiers' defects or risks in October 2012. *Exhibit 4 ¶ 25.*

149.     In October 2012, Gree USA sold at least 2,938 defective Gree dehumidifiers to retailers in the United States for approximately $429,426. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 4 ¶ 26.*

## THE GREE COMPANIES RECEIVE ANOTHER TEST REPORT SHOWING THAT THEIR DEHUMIDIFIERS ARE DEFECTIVE AND DANGEROUS

150.     In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing company for testing. On November 5, 2012, the testing company wrote a report confirming and reiterating that the Gree dehumidifiers were defective because the compressors in the dehumidifiers could run continuously and thereby overheat to an "extreme high temperature." Gree USA's CEO received this report on November 6, 2012. Gree USA's CEO immediately sent the report to Gree Hong Kong Manager #2, who had taken over responsibility for the importation and sale of the Gree dehumidifiers in the United States from Gree Hong Kong Manager #1. *Exhibit 4 ¶ 27.*

## THE GREE COMPANIES CONTINUE TO SELL THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

151.     At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an attorney advised him to inform the CPSC immediately of all consumer reports of fires related to the Gree dehumidifiers. Despite this legal advice and the November 5, 2012 test report reiterating that the Gree dehumidifiers were dangerously defective, no employee of the Gree

Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in November 2012. *Exhibit 4 ¶ 28.*

152. In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in the United States for approximately $792,067. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 4 ¶ 29.*

### THE GREE COMPANIES HAVE YET ANOTHER MEETING TO DISCUSS THEIR DEFECTIVE DEHUMIDIFIERS BUT STILL DO NOT INFORM THE CPSC

153. On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai. At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer, and the Gree Zhuhai CFO. Gree Hong Kong Manager #2, the Gree Zhuhai engineer, and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing. *Exhibit 4 ¶ 30.*

154. No employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in December 2012. *Exhibit 4 ¶ 31.*

155. In December 2012, Gree USA sold at least 1,395 defective Gree dehumidifiers to retailers in the United States for approximately $201,835. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that

LEGAL\71310861\1

these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 4 ¶ 32.*

## THE GREE COMPANIES DECIDE TO KEEP SELLING THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

156.    On January 23, 2013, a Gree USA officer sent an email to Gree Hong Kong Manager #2. The email stated that Gree USA's and MJC America's insurance company suggested that Gree USA report the Gree dehumidifiers to the CPSC and recall all of the defective Gree dehumidifiers. The email also stated that the insurance company "wanted to know if any actions were taken to test the product design in case it is defective" and was told that "the product was submitted to several different testing and no faulty [sic] in the design was found[,] also that new production has an extra protection[.]" The Gree USA officer further reported in her email that Gree USA had received a new consumer report of a dehumidifier fire and asked how Gree USA should handle this report. *Exhibit 1 ¶ 33.*

157.    Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested its dehumidifiers and that they were not defective and could be sold in the United States. Gree Zhuhai did not provide Gree USA with any details on its testing or explain the inconsistency in its test results with those of all prior tests of the Gree dehumidifiers. *Exhibit 1 ¶34.*

158.    Despite the recommendation of Gree USA's insurance company to report the Gree dehumidifiers to the CPSC and recall the defective Gree dehumidifiers, and the new consumer report of fire, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in January or February 2013. *Exhibit 1 ¶ 35.*

159.    Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that

LEGAL\71310861\1

met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 1 ¶ 36.*

### THE GREE COMPANIES FINALLY REPORT THEIR DEFECTIVE DEHUMIDIFIERS TO THE CPSC BUT CONTINUE TO SELL THOSE DEHUMIDIFIERS IN THE UNITED STATES

160.    On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers. The initial report stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to these dehumidifiers. The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn. *Exhibit 4 ¶ 37.*

161.    Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO, and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. *Exhibit 4 ¶ 38.*

162.    On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance. *Exhibit 4 ¶ 39.*

163.    On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers. This report

stated that Gree USA, Gree Zhuhai, and MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that the dehumidifiers needed to be recalled. This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013. *Exhibit 4 ¶ 40.*

164.     After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers. *Exhibit 4 ¶ 41.*

165.     The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012 through April 2013. Additionally, the Gree Companies received at least $29,500,000 from the distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013. *Exhibit 4 ¶ 42.*

166.     United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013. *Exhibit 4 ¶ 43.*

167.     From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers. *Exhibit 4 ¶ 44.*

## THE GREE COMPANIES IMPORTED THEIR DEFECTIVE DEHUMIDIFIERS WITH FALSE UL CERTIFICATIONS

168.     Between 2010 and at least until September 2012, the Gree Companies imported into the United States Gree dehumidifiers with certifications that the dehumidifiers met all UL standards when in fact the dehumidifiers did not meet UL standards. *Exhibit 4 ¶ 45.*

**THE GREE COMPANIES FINALLY RECALL THEIR DEFECTIVE DEHUMIDIFIERS**

169.    By mid-July 2013, Gree Zhuhai decided to recall its defective Gree dehumidifiers and notified the CPSC of this decision. After making this decision, Gree Zhuhai started to plan for the recall. *Exhibit 4 ¶ 46.*

170.    On September 12, 2013, Gree Zhuhai and the CPSC announced a voluntary recall of 2.2 million Gree dehumidifiers in the United States. *Exhibit 4 ¶ 47.*

171.    Despite its recall, Gree Zhuhai has received hundreds of consumer reports of fires and overheating caused by defective Gree dehumidifiers. Consumers have reported more than 2,000 incidents involving Gree dehumidifiers including 450 fires and more than $19,000,000 in property damage. *Exhibit 4 ¶ 48.*

172.    No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. *Exhibit 4 ¶ 49.*

173.    As a result of the Gree Companies' failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission, the Gree Companies were able to continue to distribute and wholesale their dehumidifiers, including defective Gree dehumidifiers, from September 2012 through April 2013, and received more than $39,000,000 in proceeds from this distribution and wholesale of Gree dehumidifiers. For purposes of forfeiture, the approximately $39,000,000 that the Gree Companies received are assets associated with their failure to report immediately their defective Gree dehumidifiers to the United

LEGAL\71310861\1

States Consumer Product Safety Commission in violation of 15 U.S.C. §§ 2068(a)(4) and 2070.
*Exhibit 4 ¶ 50*

## DEFENDANTS EXPAND THEIR RECALL OF THE DEHUMIDIFIERS

174.    On September 12, 2013, after more than 471 fires and approximately $2,725,000 in property damage, Defendants, along with the CPSC, finally announced a recall on approximately 2.2 million dangerous and defective Gree dehumidifiers distributed and sold in the United States from January 2005 through August 2013 because of fire and burn hazards. *See Exhibit 2.*

175.    More than a full year prior to the recall date, the Defendants were each aware of the dangerous defects with the Gree dehumidifiers. Despite this actual knowledge, each of the Defendants failed to ask retailers to issue a "stop sale" of the products until June 2013.

176.    Even then, not all retailers were notified.

177.    After the September 12, 2013 recall, Defendants issued press releases downplaying the severity of the recall.

178.    On January 30, 2014, the recall was expanded to include 350,000 GE-brand dehumidifiers that had been manufactured and sold by Gree China between January of 2008 and December of 2010.

179.    The recall was re-announced on May 15, 2014 due to a significant increase in the number of overheating events and fires caused by the defective Gree dehumidifiers.

180.    In the months between September of 2013 and May of 2014, the number of overheating dehumidifiers increased from 171 to 471 and the number of fires almost tripled from 46 to 121.

181.    The recalls of defective Gree dehumidifiers including the subject Dehumidifier at issue in this lawsuit were based on serious fire and burn hazards which subjected the American

public, including Illinois consumers, to grave danger including death from the recalled defective Gree dehumidifiers.

182.    Although each and every one of the Defendants knew that the recalled defective Gree dehumidifiers were not compliant with UL flammability standards, they nonetheless designed, manufactured, sold, offered for sale, distributed in commerce, advertised, marketed, and imported dehumidifiers bearing the UL mark.

183.    On November 29, 2016, more than four years after becoming aware of the hazards associated with their dehumidifiers, and after more than 450 fires, 2,000 reported incidents of dehumidifiers overheating, and nearly $20,000,000 in property damage, Gree, along with the CPSC, announced a recall of approximately 2.5 million dehumidifiers distributed and sold in the U.S. from January 2005 through August 2013 because of serious fire and burn hazards which subjected the American public, including Illinois consumers, to grave danger including death.

184.    The subject Dehumidifier was included as part of the recalls.

185.    At the time the subject Dehumidifier was purchased, the Defendants had actual knowledge that it was defective, but they failed to properly act to stop its sale and to alert retailers and consumers.

186.    As a result of the failure to timely recall, provide sufficient notification thereof, and issue a stop sale, the Plaintiff's insured, Wirtz, purchased and used the defective Gree dehumidifier which caught his house on fire and caused Plaintiff's insured, Wirtz, to suffer damages to his real and business personal property.

187.    None of the actions taken by the Defendants were sufficient to prevent the use of the defective Gree dehumidifiers by the American and Illinois public, including the subject Dehumidifier by Wirtz.

LEGAL\71310861\1

## FINES AND CIVIL PENALTIES

188.    Prior to instituting the criminal actions against Defendants, as well as certain executives who are also under indictment, the United States Department of Justice began a civil investigation into the three Gree entities.

189.    The civil investigation included allegations that the Defendants (a) knowingly failed to report a defect and unreasonable risk of serious injury to the CPSC; (b) knowingly made misrepresentations to CPSC staff during its investigation; and (c) knowingly sold dehumidifiers bearing the UL safety certification mark knowing that the dehumidifiers did not meet UL flammability standards.

190.    On or about March 14, 2016, Gree China, Gree Hong Kong, and Gree USA entered a Settlement Agreement with the CPSC ("CPSC/Gree Settlement Agreement").

191.    Pursuant to the CPSC/Gree Settlement Agreement, Gree China, Gree Hong Kong, and Gree USA admitted that they knew that the dehumidifiers were not compliant with the UL flammability standards and sold, offered to sell, distributed in commerce, and imported the dehumidifiers bearing the UL registered safety certification mark despite knowing that said dehumidifiers were not compliant with UL standards and were not authorized by UL in violation of section 19(a)(12) of the CPSA, 15 U.S.C. § 2068 (a)(12).

192.    On March 25, 2016, CPSC's Office of General Counsel obtained the provisionally accepted maximum penalty for each violation alleged by the CPSC, and the Gree Defendants agreed to pay a civil monetary penalty of $15,450,000 and to implement a compliance program. This civil penalty is a record settlement, with the Defendants being the first alleged violators of CPSC rules to reach the per violation maximum imposed by the Consumer Product Safety Improvement Act of 2008.

LEGAL\71310861\1

193.    Adding the foregoing civil monetary penalty to the criminal fines and penalties the Defendants were previously ordered to pay, the aggregate fines and penalties exceeded $91,000,000 due to their egregious, malicious, wanton, and willful actions that tragically killed and injured American citizens as a well as damaged and destroyed hundreds of American homes

## WILLFUL AND WANTON CONDUCT

194.    Defendants agreed that individuals who were directly and proximately harmed through physical injury or financial loss by a fire or overheating caused by one of the Defendants' dehumidifiers were victims of one or more crimes by these Defendants. *See Exhibit 5 ¶¶ 10 & 12*.

195.    Plaintiff, AMCO, was a victim of the criminal conduct to which Defendants have admitted.

196.    The Defendants have further admitted that they acted in willful and wanton disregard of Plaintiff's rights in their conduct as described above including but not limited to:

> a.      No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. (emphasis added) *Exhibit 4 ¶ 49.*

197.    The unqualified accuracy and truthfulness of the immediately preceding paragraph has been admitted without qualification by Defendants in the federal criminal proceedings referenced above.

198.    As set forth previously, Defendants cannot and:

> "they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts

> described in the Statement of Facts attached to this agreement in
> Exhibit B."

*See Exhibit 4, pages 27-28, ¶ 42.*

199.    As such and set forth previously, ANY denial or qualification whatsoever other than an unqualified admission to Paragraphs 194 through 196 above would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein. *See Exhibit 4, pages 27-28, ¶ 42.*

200.    Further willful and wanton conduct, acts, and omission are set forth in detail in the preceding factual recitation and following Counts and particulars set forth below which are hereby incorporated by reference as if fully set forth at length.

## COUNT I
## STRICT LIABILITY VERSUS ALL DEFENDANTS

201.    Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

202.    Defendants manufactured, imported, distributed, marketed, sold, and placed into the stream of commerce in Illinois the subject Dehumidifier.

203.    At the time the subject Dehumidifier left the Defendants' control, it was defective and unreasonably dangerous in that it:

      a.  Was designed and manufactured in such a way as to overheat and ignite during reasonable usage;

      b.  Contained plastic parts that were inadequate to withstand the temperatures they were exposed to during reasonable usage;

      c.  Lacked adequate warnings of its fire hazard;

      d.  Failed to cease functioning upon obtaining an unsafe temperature;

e. Contained parts that did not meet UL flammability ratings including its fan shroud base, center support, external cabinet, and terminal cover; and

f. Contained electric terminal sleeves that used PVC materials;

g. Was defective in design in that it was designed and assembled in a manner that allowed for runaway heating;

h. Was defective in design in that the configuration of its conductors and internal electrical connections could lead to the generation of excess heat the temperatures of which were sufficient to ignite combustible materials;

i. Was defective because of inadequate instructions and inadequate warnings in that the risk of fire could have been reduced or avoided with appropriate and adequate warnings and instructions;

j. Was defective because of inadequate warnings in that no warnings were given to consumers relating to the possibility of fire with respect to its design and manufacture as stated in paragraphs (i) and (j) above; and

k. Was otherwise defective and unreasonably dangerous;

204.    Defendants expected and intended the subject Dehumidifier to reach consumers in Illinois without substantial or other changes.

205.    The Dehumidifier, by virtue of the above defects, was in an unreasonably dangerous condition at the time it left the control of Defendants in that it could overheat, smoke, and catch fire, posing fire and burn hazards to consumers and to property.

206.    The Dehumidifier reached Wirtz without substantial change in the condition in which it was sold.

207.    The above defective and unreasonably dangerous conditions directly and proximately caused the Fire and Plaintiff's damages.

Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC

America Holdings Co., for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS VERSUS ALL DEFENDANTS

208.    Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

209.    The Dehumidifier was subject to an implied warranty of merchantability and fitness under Illinois law, which was not excluded or modified and could not lawfully be excluded or modified.

210.    The Dehumidifier did not comply with the warranty of merchantability and fitness because it was unfit for the ordinary purposes for which it was used as demonstrated by its recall.

211.    Defendants had actual notice of the subject Dehumidifier's defective nature.

212.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability and fitness, Plaintiff's insured Wirtz sustained damages to their real and business personal property located at the subject premises.

213.    Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co.,  for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## COUNT III
## NEGLIGENCE VERSUS ALL DEFENDANTS

214.    Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

LEGAL\71310861\1

215.    At all relevant times, it was the duty of all Defendants, both directly and through their employees, agents, or apparent agents, to exercise ordinary care in the design, manufacture, sourcing, testing, inspecting, marketing, distribution, and sale of the subject Dehumidifier, such that it was safe and free of defects such that Wirtz's property was not at risk of fire.

216.    Notwithstanding their said duties, Defendants were then and there guilty of one or more of the following wrongful acts and/or omissions:

      a.    Designed the subject Dehumidifier in such a way that caused it to overheat and ignite during reasonable usage;

      b.    Manufactured the subject Dehumidifier in such a way that caused it to overheat and ignite during reasonable usage;

      c.    Sourced materials used in the subject Dehumidifier which were inadequate to withstand the temperatures they were exposed to during reasonable usage;

      d.    Failed to inspect and test the subject Dehumidifier to ensure that it would not overheat and ignite during reasonable usage before placing it into the stream of commerce;

      e.    Failed to warn that the subject Dehumidifier could overheat and ignite during reasonable usage;

      l.    Failed to design the product such that it would cease functioning upon obtaining an unsafe temperature;

      m.    Distributed a product containing parts that did not meet UL flammability ratings including its fan shroud base, center support, external cabinet, and terminal cover;

      n.    Distributed a product containing electric terminal sleeves that used PVC materials

      o.    Concealed the dangerous and defective condition of the subject Dehumidifier from the United States Consumer Product Safety Commission and the general public when it had actual knowledge of its dangerous and defective nature;

      p.    Misrepresented that the subject Dehumidifier was UL-certified;

      q.    Failed to timely and properly recall the subject Dehumidifier;

r.   Failed to require that business partners demonstrate the safety of the subject Dehumidifier before distributing it into the stream of commerce;

s.   Failed to independently test the subject Dehumidifier;

t.   Violated the CPSA including but not necessarily limited to 15 U.S.C. § 2064(b)(3) and (4) in violation of, Title 15, United States Code, Sections 2068(a)(4) and 2070; and

u.   Violated UL 474 and 94;

v.   Otherwise breached the standard of care.

217.     As a direct and proximate result of one or more of the said wrongful acts and/or omissions of Defendants directly and proximately caused the Fire and Plaintiff's damages for which Defendants are liable to Plaintiff.

Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co., for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## COUNT IV
## FRAUDULENT MISREPRESENTATION VERSUS ALL DEFENDANTS

218.     Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

219.     Defendants made representations to Illinois consumers including Plaintiff's insured about the defective Gree dehumidifiers in general and the subject Dehumidifier specifically including that they met all applicable UL standards, did not need to be recalled, and were safe for their intended use and purpose.

220.     The said representations were false statements of material fact.

221.     Defendants knew when they made the representations that they were false.

LEGAL\71310861\1

222.    Defendants made the representations with the intent to induce Illinois consumers including the Plaintiff to purchase the subject Dehumidifier.

223.    Plaintiff's insured, Wirtz, reasonably believed the representations and purchased the subject Dehumidifier in justifiable reliance on the trust of the representations.

224.    The above-alleged negligent conduct of Defendants directly and proximately caused the Fire and Plaintiff's damages for which Defendants are liable to Plaintiff.

Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co., for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## COUNT V
## CONSUMER FRAUD AND DECEPTIVE
## BUSINESS PRACTICES VERSUS ALL DEFENDANTS

225.    Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

226.    Defendants made representations to Illinois consumers including Plaintiff, AMCO Insurance about the defective Gree dehumidifiers in general and the subject Dehumidifier specifically including that they met all applicable UL standards, did not need to be recalled, and were safe for their intended use and purpose.

227.    The said representations were false statements of material fact.

228.    Defendants knew when they made the representations that they were false.

229.    Defendants made the representations with the intent to induce Illinois consumers including the Plaintiff to purchase the subject Dehumidifier.

LEGAL\71310861\1

230. Plaintiff's insured, Wirtz, reasonably believed the representations and purchased the subject Dehumidifier in justifiable reliance on the trust of the representations.

231. Defendants' deception occurred in the course of conduct involving trade or commerce.

232. As a direct and proximate result of the said misrepresentations of Defendants, the Dehumidifier suddenly and catastrophically caught fire

233. Defendants' actions are in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq*.

Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co., for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## COUNT VI
## FRAUDULENT CONCEALMENT VERSUS ALL DEFENDANTS

234. Plaintiff, AMCO Insurance, hereby incorporate the allegations made in paragraphs 1 - 200 as if set forth at length herein.

235. Section 13-215 of the Code of Civil Procedure provides that "[i]f a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards. 735 ILCS § 5/13-215.

236. Defendants had superior knowledge and access to knowledge compared to other Parties and third parties of the true and dangerous condition of the defective Gree dehumidifiers in general and the subject Dehumidifier in particular including the following:

a.     No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. Exhibit 4 ¶ 49.

237.    The unqualified accuracy and truthfulness of the immediately preceding paragraph has been admitted without qualification by Defendants in the federal criminal proceedings referenced herein above.

238.    As set forth previously, Defendants cannot and:

"they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

*See Exhibit 4, pages 27-28, ¶ 42.*

239.    As such and set forth previously, ANY denial or qualification whatsoever other than an unqualified admission to Paragraph 235 above would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein. *See Exhibit 4, pages 27-28, ¶ 42.*

240.    The above referenced withholding, concealment, and suppression of information was of material facts by the Defendants who were the Parties with the superior knowledge.

241.    The CPSC, American public, and consumers, including Illinoisans and Plaintiff's insured, Wirtz, who was less experienced and/or less informed than Defendants, relied upon the lack of information about the danger posed by the dehumidifiers.

242.    As a direct and proximate result of Defendants' fraudulent concealment, withholding, and suppression of information, caused the Fire and Plaintiff's damages for which Defendants are liable to Plaintiff

Wherefore, Plaintiff, AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands judgment in its favor and against Defendants Gree USA, Inc., Gree Electric Appliances, Inc. of Zhuhai, Hong Kong Gree Electric Appliance Sales, Ltd., MJC America, Ltd., and MJC America Holdings Co., for monetary damages in the amount that is fair and reasonable to compensate for Plaintiff's losses and such other further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, Illinois AMCO Insurance Company as subrogee of Wirtz Corp Mundelein, demands the empaneling of a lawful jury to hear this case and has tendered the requisite fee.

Respectfully submitted on this 4 day of November 2024.

AMCO Insurance Company, a/s/o
Wirtz Corp Mundelein

By:    */s/ Jonathan M. Levy*
Jonathan M. Levy
Attorney for Plaintiff

**MAILING ADDRESS**:
Marisa L. Saber (#6293678)
Jonathan M. Levy (#6313350)
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Phone: 312-382-3100
Fax: 312-706-9783
msaber@cozen.com
jlevy@cozen.com

LEGAL\71310861\1